

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DCP:NMA/JOE/SME
F. #2021R00909

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 17, 2023

By ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Mark Ross
               Criminal Docket No. 21-193 (KAM)

Dear Judge Matsumoto:

      The government respectfully submits this letter in advance of the sentencing of the defendant Mark Ross. For the reasons stated below, a sentence of imprisonment below the applicable United States Sentencing Guidelines is appropriate to account for the defendant's conduct, to provide just punishment and to deter the defendant and others from similar conduct in the future.

I.    Factual Background

      A.    The Zona Energy Scheme

      From approximately March 2018 to January 2021, Richard Dale Sterritt, Jr. ("Sterritt"), together with Ross, James Christopher Pittman ("Pittman"), Michael Greer ("Greer") and others (the "Promoters") conducted an offering fraud in the common stock of Zona Energy, Inc. ("Zona"), a private company, and its successor, ERF Wireless, Inc. ("ERFB"), a public penny-stock company.[1] Pre-Sentence Report dated May 17, 2023 ("PSR" ¶ 27)). Ross and the other Promoters raised more than $16,000,000 from over three hundred investors based on a series of material misrepresentations and omissions concerning, among other things, Zona's performance, the use of proceeds from the offering, Sterritt's background and Sterritt's involvement in Zona

---

      [1]    In June 2020, ERFB completed a share exchange with Zona, whereby Zona shareholders received shares of ERFB. Zona ceased to exist as its own entity after the share exchange was completed.

Energy. (PSR ¶¶ 27, 38). Sterritt and his co-conspirators misappropriated most of the money, and Sterritt paid Ross and his family members more than $200,000 in misappropriated investor money through entities he controlled. (PSR ¶ 41).

Beginning in April 2018, Ross and the other Promoters began soliciting investors to purchase the common stock of Zona, which, through a series of transactions with other, Sterritt-controlled entities, came to own leasehold mineral rights to the La Escalera Ranch ("Ranch"), a 220,000-acre ranch in the Permian Basin of West Texas with oil and gas deposits. (PSR ¶ 30). Ross and his co-conspirators used a variety of materials to solicit investors, including a packet of marketing materials that incorporated a promotional presentation by reference. Sterritt directed the Promoters to send the marketing materials to prospective investors, and, when investors expressed interest in purchasing Zona stock, to provide the investors with the promotional presentation. As consideration for their solicitation of investors, Sterritt paid Ross and the other Promoters in cash and gave some of the Promoters (not Ross) the option to buy Zona shares at a discount. (PSR ¶ 31).

The marketing packet and promotional presentation included several false and misleading statements and omitted material information about the offering. As for misstatements, the marketing packet and promotional presentation stated that the proceeds of the offering would be used for "leasehold acquisitions and for other general business purposes," when in reality the proceeds of the offering were largely misappropriated by Sterritt for personal use and to pay the Promoters, including Ross. The materials also misrepresented Zona's commercial viability and expected cash flows. As for omissions, the marketing packet and promotional presentation most notably omitted Sterritt's secret control over Zona and his prior criminal history. (PSR ¶ 32).

Once a prospective investor expressed an interest in purchasing shares of Zona Energy, Ross and the other Promoters directed the prospective investor to Zona's "corporate secretary" ("Co-Conspirator Two") to finalize the investment. (PSR ¶ 33). Co-Conspirator Two, acting at Sterritt's direction, sold shares of Zona to investors, not only directly from Zona's treasury, but also from other entities and individuals that Sterritt controlled, including Richman Energy, and Greer. (PSR ¶ 34). Investors were thus misled into believing, based on the marketing packet, promotional presentation and statements from the Promoters including Ross, that they were purchasing shares directly from Zona when they were purchasing shares owned by Sterritt. (PSR ¶ 34). Ross was directly responsible for at least $850,000 in investments into Zona Energy. (PSR ¶ 91).

Contrary to the information provided to the investors in the marketing packet and promotional presentation, the majority of the funds that were wired by investors to purchase Zona stock were never sent to Zona and were never used for Zona's corporate purposes. (PSR ¶ 36).

B.   The ORGH Matched Trading Scheme

From approximately February 2020 to June 2020, the defendant, together with Sterritt, Magness and others, engaged in a second fraudulent scheme, namely, a matched trading scheme in the stock of ORGH. (PSR ¶ 56). In short, Ross and his co-conspirators sought to increase the price of ORGH's stock in the open market and then sell their own stock at inflated

prices by pre-arranging trades with another individual. Unbeknownst to them, the individual was an undercover law enforcement agent (the "UC") posing as a stock promoter who controlled a group of corrupt brokers that would buy the ORGH stock in the open market that Ross and his co-conspirators were selling in exchange for kickbacks. (PSR ¶ 56).

As noted above, Sterritt had been telling investors since approximately 2018 that he intended to have Zona "go public" by arranging a reverse merger between Zona and a public issuer. (PSR ¶ 58). In January 2020, Sterritt used a public OTC issuer he controlled, ORGH, to enter into a reverse merger, whereby Zona's shareholders would exchange their shares of Zona for shares of ORGH. (PSR ¶ 59).

One such Zona shareholder that acquired shares of ORGH was Legal Metrics, a nominal entity controlled by Sterritt through, among others, Magness, one of Legal Metrics' directors. In or about February 2020, Magness opened a brokerage account at a broker-dealer known for accepting deposits of penny stocks like ORGH (the "Brokerage Firm") in the name of Legal Metrics and deposited five million two hundred and fifty thousand shares of ORGH stock. (PSR ¶ 61).

Ross, Sterritt, Magness, and others then began using those shares to conduct the matched trading scheme. Beginning in or about February 2020, the UC began consensually recording a series of calls with Ross and the others to discuss and effect their scheme. (PSR ¶ 63). In those calls, Sterritt told the UC that he completely controlled the ORGH shares at the Brokerage Firm and that he wanted to ultimately sell forty to fifty million ORGH shares he controlled at a target price of $2.00 per share. (PSR ¶ 65).

Between May 19 and May 29, 2020, Ross, Sterritt and Magness coordinated their trading of ORGH stock with the UC over a series of recorded calls and captured text messages. (PSR ¶ 66). The parties matched trades on each trading days during this period at increasing prices as follows:

| Date | Price |
|---|---|
| May 19, 2020 | $0.99 |
| May 20, 2020 | $0.98 |
| May 21, 2020 | $1.26 |
| May 22, 2020 | $1.44 |
| May 26, 2020 | $1.62 |
| May 27, 2020 | $1.52 |
| May 28, 2020 | $1.72 |
| May 29, 2020 | $1.65 |

For example, on May 28, 2020, Ross had a telephone conversation with Sterritt and the undercover agent about the matched trading of ORGH stock. Ross and the undercover agent discussed engaging in matched trading of ORGH stock, including Ross obtaining trading authorization for ORGH shares held by Legal Metrics. On that call, Ross complimented the undercover agent's matched trading, stating that he "like[d] [the undercover agent's] work so far. I mean I – it's been flawless – what you've been doing, is just perfect. Perfect." (PSR ¶ 70).

On May 29, 2020, following conversations with Sterritt, Magness, and Ross, Magness signed paperwork granting Ross trading authority for stock owned by Legal Metrics. On the same day, Ross, following discussions with Sterritt, agreed with the undercover agent to trade a pre-arranged number of ORGH shares at a pre-arranged price. In another phone call, Ross told the undercover agent, "I told [Co-Conspirator Three] before at 165. I just got to tell him to put it in." In response, the undercover agent stated, "I'll big for it at a buck sixty-five and we'll take you guys out," to which Ross responded "terrific." (PSR ¶ 71).

Later that same day, Legal Metrics, through trades instigated by Ross, sold more than three thousand shares of ORGH via a matched trade to the undercover agent at a price of $1.65 per share. Then, Magness transferred some of the proceeds of the matched trading, which totaled more than $24,000, from an account at the Brokerage Firm in the name of Legal Metrics, to bank accounts at Legal Metrics controlled by Sterritt and Magness. Sterritt and Magness spent the proceeds of the matched trading on personal expenses. (PSR ¶ 72). On or about June 1, 2020, the ORGH scheme was stopped when the Securities and Exchange Commission ("SEC") suspended trading in ORGH's stock for a period of ten days. (PSR ¶ 73).

Throughout the ORGH fraud, Sterritt, Magness and Ross used pre-paid cellular telephones to communicate and engage in the matched trading of ORGH stock under the belief that their conversations would not be recorded. Sterritt further stated to the undercover agent that he was going to send him an encrypted cellular telephone and instructed him to use it to engage in matched trading, but never actually sent the encrypted telephone. (PSR ¶75).

The defendant also engaged in the payment of kickbacks to the UC. As part of the fraudulent matched trading in ORGH stock, Sterritt, Magness, and Ross agreed to make hidden kickback payments to the undercover agent in exchange for the placement of fraudulently inflated ORGH shares with the purported clients of brokers working for the undercover agent. (PSR ¶ 76). Sterritt, Magness, Ross, and the undercover agent agreed that the undercover agent be paid thirty-five percent of the value of the trades as a kickback for engaging in the fraudulent matched trading. (Id.) On April 15, 2020, Sterritt stated to the undercover agent that he would disguise the kickback payments as "marketing fees." Sterritt later stated he would explain communications with the undercover agent about the matched trading as communications related to a business to sell facemasks during the COVID-19 pandemic, a business with which the undercover agent was not involved. Sterritt further suggested to the undercover agent that he might make the kickback payments in the cryptocurrency Bitcoin because it would be the safest way to conceal the payments. (PSR ¶ 76).

The scheme was ultimately stopped on or about June 1, 2020, not because Ross and his co-conspirators decided to cease their conduct, but because the Securities and Exchange Commission

suspended trading in ORGH's stock for ten days given concerns about manipulation in the market for ORGH's stock.

II.   The Guidelines Calculation

   A.   The Applicable Guidelines

The government respectfully submits that the correct Guidelines calculation, which is consistent with the calculation set forth by Probation in the Addendum to the PSR is as follows:

| | | |
|---|---|---:|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(2)) | | 6 |
| Plus: | Loss exceeds $550,000 (U.S.S.G. § 2B1.1(b)(1)(H)) | +14 |
| Plus: | Offense involves 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Offense involves sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)) | +2 |
| Less: | The defendant was a minor or minimal participant in the offense (U.S.S.G. § 3B1.2(b)) | -3 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1) | <u>-3</u> |
| Total: | | <u>18</u> |

The defendant is in criminal history category I. See PSR ¶ 63. Offense level 18 and Criminal History Category I yield a Guidelines sentencing range of 27 – 33 months imprisonment.

   B.   The Defendant's Objections to the Guidelines are Meritless

The defendant has raised three objections to the Guidelines portion of the PSR. Two of those objections, to enhancements for the number of victims of the defendant's conduct and for employing sophisticated means, are addressed below. The third objection the defendant raises, an enhancement for violating a previous administrative or judicial order, appears to be moot. Probation has removed it from the Guidelines calculation in the Addendum to the PSR and the government agrees it should not apply to the defendant. See Addendum to the PSR, dated May 12, 2023 at p.4.

   a.   The Defendant's Conduct Involved Ten or More Victims

The defendant disputes that his criminal conduct involved ten or more victims and that the two-point enhancement in § 2B1.1(b)(2)(A)(i) should not be applied. In particular, the defendant claims that losses suffered by certain investors were not "reasonably foreseeable" to him

5

and that he was not the proximate cause of their loss. The defendant is wrong both factually and legally and the enhancement should be applied.

As the defendant concedes, "[2B1.1] does not hold defendants accountable only for certain or near-certain losses, but for losses that were 'reasonably foreseeable pecuniary harm.'" United States v. Turk, 626 F.3d 743, 750 (2d Cir. 2010) (citing § 2B1.1, App. Note 3(A)(i)). The Guidelines make plain that "reasonably foreseeable pecuniary harm" is "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." § 2B1.1, App. Note 3(A)(iv).

In support of this enhancement, the PSR cites documentary evidence, in the form of an email exchange with the defendant, demonstrating that Ross knew that investments in Zona Energy from more than 20 individuals were attributed to him and that their investments and their losses were reasonably foreseeable to him. In March of 2020, after the defendant knew that Sterritt had lied about who he was and his history of committing criminal frauds, the defendant received an email from Katie Mathews, the Corporate Secretary of Zona Energy. That email, which the defendant cites in his memorandum but does not sufficiently describe, demonstrates that each of these investors were attributed to him and that their losses were reasonably foreseeable. That email, which is attached hereto as Exhibit 1, shows that the defendant reached out to Mathews and asked for the "same excel sheet you recently sent only have it be current" and to "please make sure my list is current." Ex. 1. The defendant continued, "I would like to get organized further by having the number of options and the date sent to each person on my list who received them." The defendant clearly stated that he needed this material to continue raising money and claimed he had "been a useful teammate in a short time . . . and I am asking for something I require to do my work . . . . Based on my track record I will probably yield the results that will be worth the effort." That day and the next, Mathews sent the defendant two emails, one of which stated that she was providing "an Excel spreadsheet detailing all your investor activity." That email included an excel file, titled "List of Investors – Mark Ross," which contained the names of more than 20 investors, the amount of their investment, the number of shares they received, the date of their investment and any relevant notes. Id. At no point did the defendant respond to Mathews that these investors were not his, that he did not know who they were, or that he should not be compensated for their investments.

The defendant concedes that he "may have been the 'but for' cause for the investments made by the other investors . . . because none of them would have purchased Zona Energy stock" if it had not been for him. Def. Mem. At 6. But the defendant asserts that the enhancement should not be applied because the government has conflated "but for" and proximate causation. Id. And he makes that claim because the defendant asserts that the losses should not be attributable to him because the defendant only knew of three of the investors and only spoke with five of them after they made the investment. The defendant's arguments are wrong both legally and factually.

Notably, the defendant's importation of "proximate causation" is wrong as a matter of law. The defendant repeatedly cites United States v. Goodrich, 12 F.4th 219 (2d Cir. 2019) in support of his proximate cause requirement, but fails to recognize that Goodrich and the other cases it cites analyze whether a defendant is liable for restitution under the Mandatory Victim Restitution Act ("MVRA"), which "requires that the 'offense' of conviction "directly and

6

proximately harmed" the victim entitled to restitution. Id. at 229; see also Robers v. United States, 572 U.S. 639, 645 (2014) (The MVRA "has a proximate cause requirement."). The defendant is thus improperly importing a restitution legal standard into an assessment of loss under § 2B1.1, which as noted above, is "reasonably foreseeable pecuniary harm." When assessed through the appropriate legal standard, the defendant's March 2020 email communication establishes that pecuniary harm was reasonably foreseeable to these investors. He knew each of those victims had made investments, he knew those investments were attributed to him and he knew that pecuniary harm was a potential result to those investors.

Moreover, the March 2020 spreadsheet is not the only factual evidence that the defendant was responsible for these investors and undercuts his claims that he did not know or speak to more than three investors. For example, in November 2019, before the March 2020 spreadsheet was sent out, the defendant was sent an email by DeeAnna Looney, an employee of Sterritt's, copying Sterritt, which detailed the status of certain investors and whether their payments had yet been received. See ACCORDANT_SEC_0000986, attached hereto as Exhibit 2. That email included seven investors, five of whom were included in the March 2020 email, and all of whom the defendant denies knowing in his sentencing letter. See Def. Mem. At 6. However, in response to that email, the defendant wrote "an email and or a phone call was just made and sent to everyone on the list you sent to me." The defendant continued, "I will keep you abreast of any changes and I much appreciate if you do the same by letting me know of funds and docs hitting." See Exhibit 2.[2] Thus, whether the defendant was doing it himself or it was done by investors he had brought in, the defendant played a direct role in ensuring that these investors actually made their investments and took credit for their investments. This flatly refutes the defendant's assertion that he did not play a direct role in these investments.

Moreover, the evidence also establishes that the defendant knew, in real time, that he was responsible for sourcing investments from individuals he now claims not to know. In November 2019, the defendant forwarded to DeeAnna Looney correspondence from Phil Sassower to "Zona Energy Investors" including at least Stanley Gilbert, a purported "downstream" investor specifically referenced in the March 2020 spreadsheet. The defendant forwarded that email to Looney and provided it to her and Sterritt as an "example of what is being done to finalize things." ACCORDANT_SEC_0001044, attached hereto as Exhibit 3. He also promised them that "every single person who receives documents is paying and I believe no later than Tuesday Wednesday every penny will be in." Id. Again, this correspondence is a far cry from Ross's self-portrayal as removed from "downstream" investors; rather, it demonstrates Ross's direct involvement in each of these investments and that associated losses were reasonably foreseeable to the defendant.

Finally, in January 2020, the defendant received an email from Katie Mathews regarding missing items for certain investors, including a number of investors in the March 2020 email. Mathews asked the defendant for help in obtaining this information and the defendant replied that he will "work on this and have everything figured out by tomorrow." See ACCORDANT_SEC_0027764, attached hereto as Exhibit 4. Each of these exhibits demonstrates

---

[2] Each of the Exhibits referenced herein were produced to the defendant and most of them were produced in June 2021.

that the pecuniary harm to more than 20 victim-investors, those included in the March 2020 email and more, were reasonably foreseeable to the defendant and the two-point enhancement in § 2B1.1(b)(2)(A)(i) should be applied.

### b. The Defendant's Conduct Involved Sophisticated Means

The defendant also objects to the inclusion of a two-point enhancement for sophisticated means pursuant to § 2B1.1(b)(9)(C). The defendant asserts that the enhancement should not apply because his conduct "amounted to a garden-variety fraud—that is the omission of material facts when speaking with potential investors." Def. Mem at 7. The commentary to The Guidelines defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2T1.1(b)(2), n. 4; see also United States v. Elia, 392 F. App'x 883, 886 (2d Cir. 2010). As the defendant concedes, courts have held that "even if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together." United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003). The Application Notes to the Guidelines state that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." App. Note 9(B)

That is precisely what happened here. As the PSR notes, the defendant and his co-conspirators used a series of sophisticated means to perpetrate the fraud and conceal it from investors. Sterritt concealed his identity and prior felony conviction for similar conduct by using an alias, "Richard Richman," that was well-known to the other participants in the fraud. PSR ¶ 91. Use of that alias was integral to the fraud because it concealed from investors and potential investors that Sterritt had a criminal background, including for engaging in securities fraud. And once the defendant learned of Sterritt's true identity, he continued to solicit funds in Zona. The participants in the scheme, including Ross, also shared materially false marketing materials with potential investors, which the Second Circuit has previously identified as an indicator of sophistication. See United States v. Stitsky, 536 F. App'x 98, 112 (2d Cir. 2013) (unpub.). The conspirators made use of multiple bank accounts to raise money from investors, conceal how the money was misappropriated, and to pay themselves. In fact, Ross himself was paid from these accounts, PSR ¶ 91, while his family members were paid in cash. PSR ¶¶ 41, 91. Ross and Sterritt also concealed the true purpose of Ross's involvement in the Zona Energy Scheme through a sham consulting agreement. PSR ¶ 41. That agreement provided that Ross would provide "general business development services" but did not mention that Ross was paid to raise money from investors, and in fact provided no other services whatsoever.[3]

---

[3] Ross claims in a footnote that this sham consulting agreement has no connection to his offense conduct. Def. Mem. at 8 n.7. Ross and Sterritt used a sham consulting agreement to conceal the fact that Ross was being paid to raise money from investors, which fact he also did not disclose to the victims he recruited to the Zona Energy Scheme. The sham consulting agreement is closely intertwined with Ross's offense conduct, and, relatedly, demonstrates the sort of forethought and planning that the Circuit has previously identified as evidence of sophisticated means.

8

Taken together, the execution of the Zona Energy Scheme was sophisticated and perpetrated through "very careful planning" and with "careful effort to conceal the fraud" through false statements and nominee shareholders and accounts, and it continued for years. See Stitsky, 536 F. App'x at 112 (enumerating factors relied on by the district court to apply "sophisticated means" enhancement and approving the district court's analysis). Ross does not meaningfully dispute these facts, but claims instead that the Court should evaluate only his conduct, which did not include use of an alias or nominee accounts. See Def. Mem. at 8. To begin with, the fact that Ross was paid from nominee accounts rather than opening them himself does not separate him from this conduct. More fundamentally, conspirators like Ross are responsible for the conduct of their co-conspirators that is reasonably foreseeable and within the scope of the conspiracy. See United States v. Getto, 729 F.3d 221, 234 (2d Cir. 2013) ("A district court may sentence a defendant based on the reasonably foreseeable acts and omissions of his co-conspirators that were taken in relation to a conspiracy."); U.S.S.G. § 1B1.3(a)(1)(B) (defining "relevant conduct" to include acts and omissions of co-conspirators in furtherance of jointly undertaken criminal activity). Sterritt's use of an alias and the conspirators' use of nominee accounts undoubtedly furthered the Zona Energy Scheme. Moreover, Ross has not claimed that he was unaware of Sterritt's use of an alias or the use of nominee accounts, nor could he credibly. Ross has cited no case law in support of his line-drawing between his personal conduct and the relevant conduct of the conspirators taken as a whole, and the court should reject this false distinction.

        C.        The Court Should Not Consider the Proposed Amendments to the U.S.S.G.

The defendant has asserted that the Court "can and should consider" proposed amendments to the Guidelines announced by the United States Sentencing Commission. In particular, the defendant asserts that the Court should consider reducing the defendant's offense level under the Guidelines because of proposed new Guideline Section 4C1.1 ("Adjustment for Certain Zero-Point Offenders") which provides for a stand-alone 2-level reduction for defendants "who did not receive any criminal history points under Chapter Four, Part A and whose instant offense did not involve specified aggravating factors." Def. Mem. at 10. Moreover, the defendant asserts that the Court should also consider the proposed change to the Commentary to Section 5C1.1 ("Imposition of a Term of Imprisonment"), providing that "a sentence other than a sentence of imprisonment . . . is generally appropriate" for defendants with advisory Guidelines offense levels that fall within Zone A (Levels 1 to 8) and Zone B (Levels 9 to 11) of the Sentencing Table.

The government respectfully submits that the Court should not consider either of the proposed amendments to the Guidelines. As an initial matter, "[a] proposed amendment is not a 'sentencing guideline[ ], policy statement [ ], [or] official commentary,' and thus cannot be considered by a court in determining whether the Commission took a factor into account." United States v. Genao, 831 F. Supp. 246, 250 (S.D.N.Y. 1993), aff'd, 43 F.3d 1458 (2d Cir. 1994), and aff'd in part, remanded in part sub nom. United States v. Lara, 47 F.3d 60 (2d Cir. 1995) (citing United States v. Restrepo, 802 F.Supp. 781, 786–87 (E.D.N.Y. 1992)). Incorporating proposed amendments to the Guidelines, particularly less than two weeks after they were submitted to Congress and more than five months before they would become effective, if approved, is particularly questionable. There is no certainty that any of the Amendments will become effective particularly since, as far as the government is aware, members of Congress have not yet had the opportunity to debate or discuss the proposed Amendments, or even comment on them publicly.

Considering a further reduction to the Guideline is particularly inappropriate when, as here, the government is not asking the Court to impose a sentence in the Guidelines.

Moreover, as the defendant concedes, the change to Commentary § 5C1.1, would not apply to the defendant, even if the Court adopts all of the defendant's objections to the PSR. See Def. Mem. at 11. Under the Guidelines calculations advanced by both Probation and the government, the defendant is in Zone D and even under the defendant's calculations of the Guidelines, the defendant is in Zone C. Although the defendant claims that Zone C "is the next level up," Def. Mem at 11, notably the Proposed Amendment, even if adopted, does not cover Zone C and certainly does not cover Zone D, where the offense level should fall. The defendant's argument demonstrates how contrived his request for a non-incarceratory sentence is; the sentence he seeks is not appropriate even under the proposed Guidelines.

### III. The Appropriate Sentence

The government respectfully submits that seriousness of the offense warrants a sentence of incarceration. The government does not object to a sentence of incarceration below the applicable Guidelines range.

#### A. Applicable Law

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

B.   Analysis

As set forth below, the defendant's offense was serious and merits a sentence of incarceration. None of the factors cited by the defendant in his sentencing submission warrant a departure to a sentence of probation.

1. The Nature and Circumstances of the Offense and Principles of Deterrence Warrant a Sentence of Incarceration

The securities fraud and market manipulation scheme to which the defendant pleaded guilty defrauded more than 300 investors out of approximately $16,000,000. While not the architect of the scheme, the defendant was an important participant and profited from the lies he and others told to investors. In particular, the defendant concealed from victims that he received kickbacks for successfully soliciting investors. He was directly responsible for raising, at a minimum, $850,000 of investor funds. (PSR ¶ 91). These are funds that are gone and will likely not be recouped by his investors. And the defendant personally made over $160,000 from the scheme, which, to his credit, he has already paid back to the government.

The defendant was also a key participant in the market manipulation aspect of the scheme that, had it not been thwarted by law enforcement, would have further victimized the investing public and temporarily concealed the extent of the offering fraud through artificial increases in the price of ORGH. Contrary to the implication in the defendant's sentencing letter, the defendant's role in the scheme was not limited to misrepresentations to investors in Zona Energy.[4] Nor was Sterritt to blame for the defendant's own willing participation in the fraud and market manipulation. Indeed, the defendant's sentencing letter minimizes the extent to which enthusiastically took part in the fraud.

First, the defendant seeks to minimize his role by describing many of the victim investors attributed to him as "downstream," investors. (ECF No. 226 at 6). Regardless of whether the defendant made the initial pitch regarding the purported Zona Energy opportunity to these investors, he took responsibility for ensuring that their investments were finalized, and he was compensated in connection with their investments. As noted above, emails to and from the defendant regarding the status of certain investors demonstrate the defendant's role in obtaining

---

[4] The defendant's sentencing letter suggests that even though Count One of the Indictment pertains to Zona Energy as well as OrgHarvest, the defendant's "plea agreement. . . relates only to Zona Energy." (ECF No. 226 at n.1). That statement is inaccurate. While the defendant admitted during his change of plea hearing to defrauding investors in Zona Energy—an allocution sufficient to meet the elements of the charged offense—an allocution limited to facts related to Zona Energy does not absolve the defendant of his participation in further criminal activity constituting other aspects of the same count of conviction. Moreover, the defendant's plea agreement addresses the ORGH market manipulation aspect of the fraud: the plea agreement specifically provides that no further criminal charges will be brought against the defendant "for his participation in criminal activity involving securities fraud, wire fraud, and conspiracies to commit the same, relating to Zona Energy, Inc. (the "Zona Energy Fraud") and OrgHarvest Inc. (the "OrgHarvest Fraud"). See Plea Agreement, ¶ 5.a

11

funds, even for those investors he characterizes as "downstream." See Exhibits 2, 3 and 4. In short, the investments by purported "downstream" investors were not only fully foreseeable to the defendant, but demonstrate his key role in the offering fraud and his desire for personal financial gain, meriting a meaningful sentence.

Second, the defendant seeks to shift blame to Sterritt for his participation in the offense. The defendant cites to the "unique circumstances" under which he became acquainted with Richard Sterritt—namely, through his daughter Naomi's relationship with Sterritt —as a circumstance justifying a downward departure. (ECF No. 226 at 2). The government does not dispute that Sterritt sought to take advantage of individuals like the defendant, who faced challenging personal circumstances and who were attracted to Sterritt's apparently ostentatious wealth. But none of that excuses the defendant's willing participation in the fraudulent scheme, particularly after he learned of Sterritt's true identity and his criminal past. Indeed, rather than coming clean to his investors about who Sterritt was, the defendant doubled down and continued to raise money from investors.

Moreover, recordings of the defendant's efforts to coordinate match trades with the undercover agent demonstrate his eagerness to perpetuate the fraud through the ORGH matched trading scheme. As described above, in the May 28, 2020 recorded call in which Sterritt introduced Ross to the undercover agent, PSR ¶ 70, Ross complimented the agent's "flawless" and "perfect" execution of the scheme. On the same call, the defendant also bragged that "I have the right instincts for this. And I've been, and I've been doing it since '85." Not only did the defendant remark upon the successful execution of the market manipulation scheme, but he also wholeheartedly offered up his own services and described his own purported longstanding expertise in such matters. The defendant's own words establish his readiness to execute the ORGH match trading scheme.

    2. The Family and Personal Circumstances Cited by the Defendant Do Not Justify a Sentence of Probation

One of the main reasons that the defendant believes a non-incarceratory sentence is appropriate is because of his "unique" person and family circumstances. See Def Mem. at 2. The government recognizes that the defendant has had some difficult circumstances in his past and, indeed, it is the primary reason that the government is not seeking a sentence within the applicable Guidelines range. However, the government respectfully submits that the defendant's family circumstances do now warrant the extraordinary downward departure, to a non-incarceratory sentence, that the defendant seeks.

Although the defendant has faced adversity in his life, he is lucky enough to have relative financial security and strong family ties, which many defendants appearing before the Court do not. He has supportive relationships with his ex-wife, his four children, his stepmother and his sister. (PSR ¶¶ 117-126). He lives in a nice home with an indoor pool with or near his family and is supported by his son. (PSR ¶¶ 128-29). While two of his daughters have serious physical and mental health issues, he has a support system in place, in the form of his two other children and his ex-wife, to help manage those situations. Accordingly, the extraordinary family circumstances that the Second Circuit has held to warrant a downward departure are wholly absent in this case. For example, in United States v. Alba, 933 F.2d 1117, 1122 (2d Cir. 1991), the court

found extraordinary circumstances where the defendant and his wife cared for their four- and eleven-year-old daughters and the defendant's disabled father and paternal grandmother. Those circumstances stand in stark contrast to those at issue here. The defendant does not have young children relying on him for support and several other members of the defendant's family are capable of caring for the defendant's daughter should he be sentenced to a term of incarceration. See United States v. Deutsch, 104 F. App'x 202, 204 (2d Cir. 2004) (finding downward departure justified where defendant's wife and other relatives were unable to support the defendant's children during his period of confinement); see also United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003) (per curiam) (rejecting departure where only one of the defendant's six children was under eighteen and there was no finding made that the defendant was the only family member capable of supporting her family).

While the government acknowledges the significant hardship visited upon the family of an incarcerated defendant in this case or any other, the unfortunate circumstances of the defendant's punishment are of his own making. The defendant had every opportunity to develop a legitimate career, but he chose to commit fraud instead. In short, none of the circumstances cited by the defendant justify the extraordinary departure he seeks.

3. The Need for Deterrence

The defendant claims that a non-custodial sentence is appropriate because he has been deterred from committing crimes "because he will never again be in a position to commit the same crime of criminal offense." Def. Mem. At 27. To the contrary, he defendant's history in the securities industry also demonstrates the need for specific deterrence and further supports a sentence of incarceration. See 18 U.S.C. § 3553(a)(2)(B). As the PSR makes clear, the defendant is an experienced investment professional with multiple securities licenses, including supervisory licenses. See PSR ¶ 143. The defendant was the principal of a brokerage firm that was fined for engaging in a prohibited solicitation in connection with a private placement offering and for "making misrepresentations/omissions in a memorandum used in connection with a private self-offering." Id. at ¶ 144. The defendant had been the head of a firm that was punished for exceedingly similar activity; he thus had ample reason to know the importance of dishonest conduct in the solicitation of investors and knew what he was doing was wrong. Yet he did it again to make money.

Specifically, the defendant has a lengthy history of disciplinary action in the securities realm in connection with his work as the president of Franklin Ross, Inc., including censure by the National Association of Securities Dealers and suspension of and eventual revocation of the defendant's securities license by FINRA. PSR ¶¶ 144, 145. Both the defendant and his firm had their licenses revoked by FINRA following a series of violations related to his penny-stock trading firm. (PSR ¶ 145). Nevertheless, the defendant agreed to engage in manipulative match trading of ORGH stock in which Ross complimented the undercover agent's matched trading, stating that he "like[d] [the undercover agent's] work so far. I mean I – it's been flawless – what you've been doing, is just perfect. Perfect." (PSR ¶ 70). Among other things, these comments demonstrate the defendant's experience trading penny stocks and matched trading, as well as his eagerness to engage in such conduct despite his past FINRA termination.

13

Taken together, the defendant's willingness to engage in fraud despite his disciplinary history means the Court should not credit the defendant's statement that he will not be in a position to commit similar crimes in the future. Despite everything in his past, including his FINRA termination, the defendant was not deterred from raising money for a private company based on misrepresentations, and he was not deterred from engaging in fraudulent match trading,. Viewing the defendant's participation in the instant criminal scheme in this context underscores the need for specific deterrence; financial penalties and supervision have historically failed to deter the defendant from engaging in financial crimes. Only a sentence of incarceration would finally send the message that the defendant is accountable for the deception and fraud that has been a partt of his career.

Moreover, these same facts demonstrate the need for general deterrence. A non-custodial sentence for a formerly licensed securities professional who raised money from investors based on material misrepresentations and who engaged in a match trading scheme that aimed to steal $100 million sends the message that the criminal justice system does not take frauds that victimize the investing public seriously.

IV.     Conclusion

For the reasons set forth above, the government respectfully submits that the Court should sentence the defendant to a term of incarceration below the applicable Guidelines.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/ David C. Pitluck
David C. Pitluck
Sarah Evans
Nick M. Axelrod
John O. Enright
Assistant U.S. Attorneys
(718) 254-7000

cc:     Clerk of the Court (KAM) (by ECF)
Harlan Protass, Esq. (by ECF)
U.S. Probation Officer Frank Nikolaidis (by Email)